EDGAR H. HUGHES COMPANY, INC.,
Plaintiff,

v.

The TURNPIKE AUTHORITY of
KENTUCKY, Defendant.

No. 408.

United States District Court,
E. D. Kentucky,
Frankfort Division.

Feb. 5, 1973.

Joseph J. Leary, Frankfort, Ky., for plaintiff.

Jim Robinson, Asst. Atty. Gen., Cyril E. Shadowen, Dept. of Highways, Frankfort, Ky., for defendant.

## MEMORANDUM

SWINFORD, District Judge.

The record of this case is before the court on the defendant's motion to dismiss the complaint for the reason that the court lacks jurisdiction. More specifically the defendant, the Kentucky Turnpike Authority, contends that the Kentucky Department of Highways, an agent of the Commonwealth of Kentucky, is the real party in interest, and that said real party in interest is not amenable to federal diversity jurisdiction by reason of the Eleventh Amendment to the Constitution.

For the purpose of deciding this motion the facts of the case need not be detailed. Suffice it to say that the plaintiff, Edgar H. Hughes Company, Inc., a citizen of Indiana with its principal place of business in Indiana is suing the Kentucky Turnpike Authority to recover damages arising out of the defendant's alleged negligence. The sole question before the court is whether the defendant is sufficiently disassociated with the state or an agent of the state so as not to be considered an alter ego of the state or an agent of the state thereby making the state the real party in interest. Succinctly put, may the Kentucky Turnpike Authority be considered a citizen of the state so as to come within this court's diversity jurisdiction.

The same question raised by the defendant's motion was decided by this court in S. J. Groves & Sons Co. v. The Turnpike Authority of Kentucky, No.

262 Frankfort Division, 1966. There the Turnpike Authority's motion to dismiss for lack of jurisdiction upon the same contentions as here asserted was overruled. As counsel for the plaintiff states in his brief, "There probably is no better precedent in this court than its own orders." In Civil Action No. 262 on this docket, the court by its order of June 8, 1966, apparently sustained the position taken by the plaintiff here in holding that the court had jurisdiction over an action against the Turnpike Authority of Kentucky. This, however, is not a reported case and there is no memorandum or opinion of the presiding judge setting forth the circumstances prevailing at the time or the reasoning on which the determination was made. The court concedes the full import of its own ruling in what appears now to be an identical situation. Nevertheless, in the light of its present research and study of this question it cannot in good conscience follow its decision on the motion to dismiss in Groves v. The Turnpike Authority of Kentucky.

A casual reading of the statutory provisions and legal documents pertaining to the Kentucky Turnpike Authority yields the conclusion that the Authority has no meaningful existence apart from the Highway Department. KRS 175.-430, an introductory section, provides that:

"(1) The governor, the lieutenant governor, the commissioner of highways, the state highway engineer, and the attorney general, and their respective successors in office, shall be a body corporate and politic constituting a public corporation and governmental agency and instrumentality of the commonwealth by the name of 'The Turnpike Authority of Kentucky,' with perpetual succession and with power in that name to contract and be contracted with, sue and be sued, have and use a corporate seal, and exercise, in addition to the powers and functions specifically stated in this chapter, all of the usual powers of private corporations to the extent that the same are not inconsistent with specifically enumerated powers."

While the language in the latter part of this section seems to indicate an intent to create a freestanding corporation, further examination of the statute displaces this initial impression. KRS 175.430(3) deals with the location and controlling members of the Authority:

"The governor shall, by virtue of his office, be the chairman of the authority and the lieutenant governor shall in like manner be the vice-chairman. The authority shall elect a secretary and a treasurer who shall not be members of the authority, each of whom shall serve at the pleasure of the authority and shall receive such compensation as may be determined by the authority with approval of the commissioner of personnel to be paid from the budgeted funds of the department. . . . The authority shall establish and maintain an office in premises which shall be provided for that purpose by the department of highways without cost to the authority. . . ."

The placement of high government officials in key positions, as well as the allowance for state-provided office space and salaries, reflect a desire that the control and situs of the Authority's operations be placed directly in the hands of the state.

While the intent manifest in the above legislation is significant, an even more important criterion is the extent of the Authority's financial involvement with and dependence on the state. Other statutory provisions, and the documents to which they relate, indicate that this "corporation" enjoys no true financial independence. KRS 175.460 provides that the Authority and Highway Department are authorized to enter into agreements relating to the financing, construction and operation of turnpikes, which agreements may include provi-

sions binding the Department, upon completion of a turnpike, to

> "continuously pay all or any part of the cost of repairing, maintaining and operating the project as a public highway provided for the use of the commonwealth, equitably belonging to the commonwealth, and intended for ultimate unencumbered ownership by the commonwealth. . ." Subsection (6).

> "(7) Agree that upon the happening of stated events and the performance of stated conditions not inconsistent with law, the authority shall convey the project to the commonwealth. . . ."

While the statute blandly provides that the responsibilities enumerated in Subsection (6) "may" be undertaken by the Department, the executed agreement stipulates that these burdens *are* assumed by the state. Agreement of February 18, 1969, Sections 601, 602. Section 701 of this Agreement effectuates the language in Subsection (7) above: upon refund of the bonds, the project

> "if then in good condition and repair as determined by the Department, shall be conveyed by the Authority to the Commonwealth and shall become part of the state highway system and shall thereafter be maintained by the Department free of tolls."

Further enlightenment is found in KRS 175.470, which permits leasing arrangements between the Authority and the Department and sets out a number of acceptable provisions for inclusion in such a lease. Again, although the statute merely states that these items "may" be agreed upon, the lease incorporates them in nearly identical language. Pursuant to KRS 175.470(2), and in Section 302 of the lease dated March 6, 1969, the Department assumes responsibility for the maintenance and repair of the turnpike, not merely for the term of the lease, but until the bonds are ultimately retired. Thus, in the unlikely event that the Department decides not to renew its lease, it is still responsible for

the maintenance of the turnpike involved. Subsection (8) of this provision and Section 401 of the lease state that the project revenues as well as $5/7$ of the gasoline taxes collected from vehicles using the turnpike, are to be applied toward the "rent" due the Authority. These amounts are payable even if the Department does not renew its lease. Clearly, such provisions reveal a financial involvement by the state transcending the normal leasing arrangement.

KRS 175.450(3), permitting the Authority to issue bonds to pay for various projects, is supplemented by provisions authorizing certain financial arrangements with the Department. KRS 175.-460. However, further examination of the relevant documents indicates that the Authority is not the entity ultimately responsible for the repayment of these debts. Section 401 of the trust indenture of January 1, 1969, establishes a "Construction Fund" composed of capital received for particular projects and provides that this fund is subject to a lien in favor of the bondholders. Section 302 of the agreement states:

> "(I)f, after the cost of the project has been finally determined . . ., the part of such cost then remaining unpaid exceeds the amount reserved to meet such unpaid cost, the Department shall, if the lease shall then be in effect, pay to the credit of the Construction Fund from the funds and other resources available to it . . . and in addition to the rentals payable by the Department to the Authority . . . such portion of the amount, or the entire amount if necessary . . . as shall be required to make the amount in the Construction Fund equal to the amount necessary to meet such unpaid cost."

These provisions, taken together, indicate that the state, not the Authority, ultimately bears the debt: should the agreed "rentals" be insufficient to pay for the project, public funds will be used to satisfy the deficit.

The statutory language alluding to an "independent" Authority is obviously belied by its *de facto* bonds with the state. A more detailed analysis of Chapter 175 and the other documents governing the relations of the Authority and the Department would doubtless uncover other evidence of the Authority's dependent posture. Such probing is unnecessary, for even a cursory examination of this relationship reveals that the Authority is no more than an arm of the state.

Harrison Construction Co. v. Ohio Turnpike Commission, 272 F.2d 337 (6 Cir. 1959), cited by plaintiff, held that the Ohio Turnpike Commission was not the alter ego of the state. The discussion in that case indicates that the Ohio Commission enjoyed considerably more independence than its Kentucky counterpart. In Ohio,

"The salary of the commissioners and all expenses incurred by them . . . shall be paid from the proceeds of the bonds provided for in the Act and the operating revenues of the project. The commission shall not incur any liability or obligation beyond the extent of these funds, nor can it incur any indebtedness or liability on behalf of or payable by the state or any political subdivision thereof." Id. at 338.

The Kentucky statute provides, in KRS 175.430(2), that the directors of the Authority shall be unsalaried, but that the Secretary and Treasurer of the Authority be paid with state funds.

The Sixth Circuit also commented upon Ohio Commission's financial independence:

"(It) is authorized to issue revenue bonds in its name to finance a turnpike project but the principal and interest on such bonds are to be paid solely from the revenue received from the operation thereof . . ."

It is apparent that the Legislature very carefully immunized the treasury of the state from any obligations whatever arising out of the creation of the turnpike commission or any projects which it might undertake." Id. at 339.

The Kentucky treasury is not so immunized; as noted in the discussion above, the Highway Department is bound to satisfy from state funds whatever deficit is incurred during the term of the lease.

While the Kentucky and Ohio Turnpike Commissions are comparable in several respects, the governmental interest in the financial operation of the Kentucky Authority is much more pervasive. Consequently, the holding in Harrison is not controlling in the case at bar.

A number of cases involving this issue are gathered in 6 A.L.R. Fed. 615, where it is suggested that

"(t)he most reliable index of the status of an agency as citizen or sovereign has been the financial or other beneficial interest of the state in the affairs of the agency or in the outcome of the litigation involving it, the courts generally holding that a financial or beneficial interest of the state indicates that the agency is not a citizen . . ." 6 ALR Fed. at 620.

While other decisions analyzing this question have reached contrary results, those cases have involved relatively autonomous commissions governed by statutes insulating the state from financial responsibility. The dependent financial status of the Kentucky Authority, in conjunction with the magnitude of the interest on the part of the Department of Highways in its operations, leads this court to hold that the Kentucky Turnpike authority is no more than an alter-ego of the Commonwealth.

■ Since the authority is merely an arm of the state, it follows that the Commonwealth is the real party in interest in these proceedings. In view of the well-settled authority that a state is not a "citizen" as contemplated in 28 U.S.C. § 1332, there is no basis for diversity jurisdiction; therefore, this action must be dismissed. See Postal Tele-

graph Cable Co. v. Alabama, 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231 (1894); Krisel v. Duran, 386 F.2d 179 (2 Cir. 1967), cert. denied 390 U.S. 1042, 88 S. Ct. 1635, 20 L.Ed.2d 303 (1968).